CHARLES H. COBB *vs.* LIBRARY BUREAU.

WALTER R. WASHBURN *vs.* SAME.

Suffolk.　March 15, 1927. — May 21, 1927.

Present: RUGG, C.J., BRALEY, PIERCE, CARROLL, & WAIT, JJ.

*Equity Pleading and Practice,* Premature suit. *Contract,* Construction. *Corporation,* Officers and agents.

When a right does not exist, or grow out of a right existing, when a suit in equity based upon its existence is begun, relief cannot be granted on facts happening after the commencement of the suit.

A vice-president and stockholder of a corporation made with the corporation a contract in writing whereby he became a subscriber for a certain number of shares of its corporate stock to be paid for in part by annual instalment payments of cash and in part by the application of a stipulated extra compensation to be earned by him; the contract further providing that if the subscriber should cease to be an officer or employee of the corporation or its business successor or assigns previous to the completion of payments of the subscription, the corporation should have certain options "to be exercised within sixty . . . days from the date of such termination," one of which was to sell the stock on a broker's board and to account to the subscriber for any balance beyond the unpaid purchase price. Subsequently, there occurred a transfer of control of the stock of the corporation. On October 27, 1925, the subscriber made with the corporation and the person who had

acquired control an agreement by which the subscriber was "given the absolute privilege of paying enough additional cash to make with the credits to January 1, 1927, full payment for one-half the stock subscribed for by . . . [him] and receiving such stock," and the new owner of control agreed that he would, "if so requested, pay . . . [him] $40 per share for it on January 1, 1927, without affecting the balance of . . . [his] Stock Subscription Contract." The subscriber thereafter resigned as an officer and his resignation was accepted to be effective on January 31, 1926. On March 31, the corporation mailed a letter attempting to exercise the option above described, which the subscriber received on April 3 and which included an alleged tender by a check of an amount less than was due to the subscriber in accordance with the option. On June 23, 1926, the subscriber brought a suit in equity to enforce specific performance of the agreement "as amended October 27, 1925," by delivery to the defendant of a certain number of shares upon payment of a certain amount of money. *Held*, that, while a finding that the corporation's attempted exercise of the option was ineffectual was warranted, the suit was prematurely brought and must be dismissed.

TWO BILLS IN EQUITY, filed in the Superior Court on June 23, 1926, for decrees directing the defendant specifically to perform the contract of January 2, 1925, as amended October 27, 1925, described in the opinion, and to deliver to the plaintiff Cobb 750 shares of its common capital stock upon payment to it of the sum of $9,176.26, and to the plaintiff Washburn 1,500 shares on payment of $18,400.

In the Superior Court, the suits were heard together by *McLaughlin*, J., a stenographer having been appointed under G. L. c. 214, § 24, Equity Rule 29 (1926), to take the evidence. Material facts found by the judge are stated in the opinion. The findings relating to the notice by the defendant as to the exercise of its option were as follows:

"Some correspondence ensued [after the resignation of the plaintiff Cobb], and under date of March 31, 1926, the defendant company notified the plaintiff by letter that it thereby exercised the option of cancelling the agreement by returning and paying him the amounts theretofore paid upon the purchase price of the shares subscribed for by him, enclosed a check for $3,316.66, to cover the plaintiff's payments with interest, and added that 'this cancellation, of course, carries with it a revocation of the offer made to you in a memorandum dated October 27, 1925, signed by J. H. Rand,

Jr.' This letter was received by the plaintiff on April 3. Whether the option was exercised seasonably, and in accordance with the provisions of clause II of the original agreement, i.e., within sixty days from the day when the plaintiff ceased to be an officer or employee of the company, depended, of course, upon the question as to when he ceased to be an officer or employee. I find that he ceased to be an employee within the meaning of the contract on January 31, and furthermore that the amount of the enclosed check was less by $8.08 than that to which the plaintiff was entitled, viz., the total of all the amounts he had paid in with interest. And I find that he had then ceased to be an officer and director, the only contention of the defendant in this respect being that as late as March, 1926, the plaintiff was a director of the company, if not *de facto* at least *de jure*. On April 26 a new tender was made of the correct amount but I find it was too late. Upon all the evidence, and having in mind that where a contract reserves to one of the parties a right under certain circumstances to rescind or cancel it, for one party to exercise such a right without the assent of the other, the provisions of the original reservation must be strictly followed (Williston on Contracts, § 1826; *Wright* v. *Bristol Patent Leather Co.* 257 Penn. St. 552), I find that the defendant did not exercise its right to cancel the agreement within the period and in the manner specified in the option. The question then arises as to the effect upon the rights of the parties of the defendant's failure to seasonably exercise its option to cancel in either of the ways prescribed in clause 3 of paragraph I."

By order of the judge, final decrees were entered dismissing the bills. The plaintiffs appealed.

*E. A. Whitman,* (*L. Weyburn* with him,) for the plaintiffs.

*L. Powers,* for the defendant.

PIERCE, J. These two suits in equity depend on the same statement of facts, with minor differences, and raise the same questions of law. The plaintiff in each suit seeks specific performance by the defendant, a corporation organized under the laws of the State of New Jersey, and having a principal place of business in Boston in the Commonwealth of Massachusetts, of a written extra compensation and stock

subscription agreement dated October 27, 1925; the specific relief sought being the delivery of certain shares of common stock of the defendant upon the payment to it by the plaintiffs of certain specified sums. Both bills were filed June 23, 1926. The cases were tried together. In each a commissioner was appointed to take the evidence to be reported to this court. The trial judge entered findings and an order for decree in each case. Following this order, on December 17, 1926, final decrees dismissing the bills with costs were entered, and the plaintiffs appealed to this court.

The pertinent facts are as follows: The plaintiffs on January 2, 1925, then being substantial stockholders in, and two of the three vice-presidents of, the defendant corporation, each subscribed for shares of the common stock of the Library Bureau and agreed to pay therefor the sum of $100 per share in the manner set forth in a written contract, and the company agreed to issue and sell the said stock and receive payment for the same as provided in the agreement, and subject to all the terms thereof. Under these contracts each plaintiff was in each calendar year to pay in cash six and one quarter per cent of the total amount of his subscription; and the company at the end of each calendar year undertook and agreed to credit or pay in cash to the subscriber, as extra compensation for his services during the preceding calendar year, six and one quarter per cent of the subscription; this was to be applied upon the purchase price of the shares subscribed for, provided the subscriber was not in default in his payments, so long as any balance remained unpaid and the subscriber was still in the active employ of the company. After full payment, the subscriber was entitled to receive the stock issued free from all restrictions, and the same dividend on his stock as other holders of common stock received. But so long as any part of the subscription was unpaid, and the option in the agreement remained in force, the stock subscribed for, the subscription, or any right thereunder, could not be assigned, sold, pledged, or otherwise transferred by the subscriber except with the consent of the board of directors.

"'In case the Subscriber shall cease to be an officer or employee of the Company or its business successor or assigns from any cause whatsoever other than death or physical disability prior to the completion of payment of the above subscription, said Company shall have the following options, one or the other to be exercised within sixty (60) days from the date of such termination: (1) Of cancelling this Agreement by returning and paying to the Subscriber all the amounts theretofore paid upon the purchase price of the shares subscribed for; or (2) Of selling the stock subscribed for at the subscription rights hereunder at any broker's board or at public auction in the City of Boston, Massachusetts, at any time or times without advertisement or notice, and with the right to the Company to become a purchaser thereof freed and discharged of any equity of redemption, and applying the net proceeds to the liquidation of any unpaid balance hereunder, returning the overplus, if any, to the Subscriber; and the Subscriber shall still remain liable for any amount so unpaid.' In case, prior to the completion of payment of the above subscription the Subscriber shall die or cease to be employed by the Company or its business successor or assigns by reason of physical disability, he or his estate, as the case may be, shall be entitled to receive Common Stock at par value up to the nearest even multiple of $100. below the amount of all payments theretofore made upon the above subscription, including extra compensation to the date of such death or termination of employment. This subscription shall thereupon be and become ipso facto cancelled as to the balance of said stock and the Company shall repay to said Subscriber or his estate the balance of the subscription account over and above such even multiple of $100., if any. . . . In the event of a cancellation of this agreement in any manner above provided or in the event of a termination of the Subscriber's employment by the Company from death or any other reason, the Subscriber's account shall be credited with only a pro rata proportion of the extra compensation payment for the calendar year in which such cancellation or termination shall occur, representing the period from the first of the calendar year to the

date of such cancellation or termination of employment, and thereafter all credits for extra compensation shall cease."

After the agreement had been in force about a month, in February, 1925, the company was recapitalized and holders of common stock became entitled to receive six shares of new stock of no par value for one of the old, the par value of which was $100. In the late summer or fall of 1925 negotiations were begun between holders of the majority of the common stock of the defendant corporation for its sale to the Rand Kardex Bureau, Inc., a New York corporation engaged in similar business and having headquarters in Tonawanda, New York. These negotiations were conducted by N. B. H. Parker, president of the defendant, and by James H. Rand, Jr., president of the Rand Kardex Bureau. In October, Rand agreed with the plaintiffs that if each would sell him the shares of stock which the plaintiff owned outright under the new allotment at $41 a share, and to which the subscription agreement in no way related, Rand would enter into an agreement for the ultimate purchase of one half of the subscription stock when it was fully paid for, and the Library Bureau would approve and adopt his agreement as its own. Accordingly the plaintiffs transferred the shares which they owned outright; and on October 27, 1925, Rand signed, and on November 2, 1925, the defendant corporation approved and adopted as its own, the new agreement, which reads in part as follows: "The three Vice-Presidents to be given the absolute privilege of paying enough additional cash to make with the credits to January 1, 1927, full payment for one-half the stock subscribed for by them and receiving such stock and Rand, Jr. will, if so requested, pay them $40 per share for it on January 1, 1927, without affecting the balance of their Stock Subscription Contract."

On January 13, 1926, Cobb tendered his resignation, to take effect January 31, and received on January 15, an acceptance "effective January 31, 1926." Under pressure and at the suggestion of Rand, Washburn resigned on January 18, 1926, as of January 31, 1926. In connection with these resignations the treasurer of the defendant

promised each plaintiff to give him an extra month's salary in view of the time he had been with the company, but he was to have no responsibilities or duties after January 31, 1926, and his time was to be his own. On February 9, each plaintiff received a "salary check" for February, 1926. The judge, warranted by the evidence, found that both plaintiffs ceased to be employees within the meaning of the contract on January 31, 1926.

Without a summing up of the evidence, we think it warranted the finding by the judge that neither plaintiff was a director after January 31, 1926, within the meaning and purview of the New Jersey general corporation act, § 39, which reads: "No person shall be elected a director of any corporation issuing stock unless he shall be, at the time of his election, a *bona fide* holder of some of the stock thereof, and any director ceasing to be a *bona fide* holder of some of the stock thereof shall cease to be a director." The resignations in January manifestly were intended to be from all offices. The fact that one share of preferred stock stood in the name of each plaintiff from November 2, to December 8, 1925, and one share of common from December 8, until March 29, 1926, is *prima facie* but not conclusive evidence that the plaintiffs were qualified to be directors. There is nothing to show that these plaintiffs ever had possession of such stock, and the evidence is convincing that the shares were the property of the corporation put in the names of the plaintiffs in furtherance of some scheme touching the organization or control of the company. *Longyear* v. *Hardman*, 219 Mass. 405. *In re Election of St. Lawrence Steamboat Co.* 15 Vroom, 529, 541.

On March 31, 1926, the defendant mailed letters to both plaintiffs attempting in each to exercise the "option" granted the defendant under clause (2), *supra*, of cancelling the extra compensation and stock subscription agreements by paying to each of them the amounts theretofore paid upon the purchase price of the shares subscribed for, assuming, as the judge found, that the additional agreement of October 27, 1925, was a modification of the original agreement and that it was governed by the terms and conditions

of that agreement. The evidence warranted the finding of the judge that the "option" was not exercised seasonably and in accordance with the provisions of clause (2), *supra*; and more particularly the findings that the right reserved was not exercised within sixty days; that the amount tendered by check was less than the amount due the plaintiff in each case, and because tender by check is not a legal tender.

We think the effect of the supplementary agreement was to divide the subscription agreement into two distinct parts. In the first, a continuance of the employment was contemplated; in the second, a new and distinct contract was created, supported by ample consideration, whereby the plaintiffs were permitted at any time before January 1, 1927, to make full payment of the portion of the subscribed stock which was separated by the original contract from the full subscription, and the defendant became obligated to pay them $40 a share on January 1, 1927, if at that time the subscription half of the stock was paid for, in full. Manifestly there was no breach of this contract when the suits were begun in June, 1926, or when the bills were dismissed on December 17, 1926. When the bills were filed the plaintiffs had no rights of action at law or in equity against the defendant, so far as the testimony discloses. The rights to specific performance sought to be enforced in these suits do not grow out of any matter on which the bills were founded; they are entirely original and not derivative. When a right does not exist, or grow out of a right existing, when a suit is begun, relief cannot be granted on facts happening after the date of the suit or writ in equity, when in like circumstances an action could not be maintained at law. *Daniels* v. *Newton*, 114 Mass. 530. *Collins* v. *Snow*, 218 Mass. 542, 545. *De Nuccio* v. *Caponigro*, 259 Mass. 365.

*Decrees affirmed with costs.*